JUDGE OETKEN

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

13 CIV 5299



| SECURITIES AND EXCHANGE COMMISSION, | |
|---|---|
| Plaintiff, | |
| v. | Case No. |
| CEDRIC CAÑAS MAILLARD and JULIO MARÍN UGEDO, | ECF Case |
| | Jury Trial Demanded |
| Defendants. | |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

### SUMMARY OF THE ACTION

1.      This matter involves insider trading by Defendants Cedric Cañas Maillard ("Cañas") and Julio Marín Ugedo ("Marín") (collectively, "Defendants"), two Spanish citizens, in the securities of Potash Corporation of Saskatchewan Inc. ("Potash" or "the company"), a Canadian company that controls 20% of the global potash supply.

2.      During 2010, Cañas was a high-ranking official at Banco Santander, S.A. ("Santander"), headquartered in Madrid, Spain and the largest bank in the Eurozone. Until he was terminated in January 2011, Cañas served as an adviser to Santander's Chief Executive Officer ("CEO"). Marín is an attorney and a former Spanish judge, and also is a close, personal friend of Cañas.

3.      On August 5, 2010, while working in Santander's offices in Madrid, Spain, Cañas learned that Santander had been asked by BHP Billiton ("BHP"), the world's largest mining

company by revenue, to serve as a financial advisor and help underwrite BHP's confidential, proposed acquisition of Potash. On August 9, 2010, Cañas learned that Santander had approved the financing commitment for the potential Potash acquisition.

4.    Between August 9 and 13, 2010, Cañas purchased the equivalent of 30,000 shares of Potash common stock through highly-leveraged securities known as Contracts-for-Difference ("CFDs"). Cañas also informed his friend Marín about the potential acquisition and advised him to trade. Marín purchased 1,393 shares of Potash stock between August 10 and 12, 2010.

5.    On August 17, 2010, Potash publicly announced that its Board of Directors had received and rejected an unsolicited $38.6 billion dollar offer to purchase Potash's common stock for $130 per share, a 16% premium to Potash's closing price on the previous day. Even though Potash rejected BHP's tender offer, the share price for Potash stock soared, closing on August 17, 2010 at $143.17, up $31.02, or more than 27%, from the previous day's close.

6.    On August 17th, Cañas liquidated his entire CFD position in Potash and realized a net profit of $917,239.44. On August 17th and 19th, Marín sold his own shares of Potash stock for a net profit of $43,566.

7.    By knowingly and recklessly engaging in the conduct described in this Complaint, Defendants violated and, unless restrained and enjoined by this Court, will continue to violate Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5 and 14e-3 thereunder.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1, and 78aa]. The Defendants have directly or indirectly made use of the means or instrumentalities of

interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this complaint.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(3) and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Southern District of New York and elsewhere within the United States.  Potash stock is listed on the New York Stock Exchange ("NYSE") and certain of the trades at issue occurred on the NYSE.  Cañas also owns an apartment in New York, New York.

## DEFENDANTS

10.     **Cedric Cañas Maillard**, age 40, is a Spanish citizen who currently resides in Madrid, Spain.  From May 1, 2008 through January 2011, Cañas served as the Technical Cabinet Adviser to Santander's CEO.  Cañas has an MBA from Harvard Business School.  In addition, Cañas has a U.S. social security number and owns apartments in New York, New York and Miami, Florida.  Between the summer of 1998 and January 2008, Cañas periodically lived and worked in the United States.  Since 2008, Cañas has travelled frequently to the United States, and he maintains bank and brokerage accounts at financial institutions within the United States.

11.     **Julio Marín Ugedo**, age 42, is a Spanish citizen who resided in Madrid, Spain during 2010 and currently resides in Badajoz, Spain.  Marín is an attorney and former Spanish judge, and is a close, personal friend of Cañas.  Marín has traveled frequently to the United States.

3

## RELATED ENTITIES

12.     **Potash Corp. of Saskatchewan Inc.** is a Canadian company headquartered in Saskatoon, Saskatchewan, Canada. Potash is the world's largest producer of potash by capacity, the world's third largest producer of phosphates by capacity, and the third largest nitrogen producer worldwide by ammonia capacity. Nitrogen, potash, and phosphates are the three primary crop nutrients used to produce fertilizer. Potash controls 20% of the global potash supply. Potash stock trades on the NYSE and the Toronto Stock Exchange, and its options trade on the Chicago Board Options Exchange.

13.     **BHP Billiton** is an Anglo-Australian multinational mining, oil, and gas company and is the world's largest mining company by revenue. BHP's global headquarters is located in Melbourne, Australia.

14.     **Banco Santander, S.A.**, the largest bank in the Eurozone, is headquartered in Madrid, Spain. During 2010, Santander served as a financial advisor and potential underwriter to BHP in connection with BHP's proposed acquisition of Potash.

## FACTS

### A.     BHP Makes an Offer to Acquire Potash

15.     On August 3, 2010, BHP's CEO contacted the President and CEO of Potash to request a meeting during the week of August 9, 2010, and a meeting was scheduled for August 12, 2010 in Chicago, Illinois.

16.     On August 4, 2010, BHP approached Santander and inquired whether Santander could support a $10.5 billion portion of the underwriting in connection with BHP's confidential, proposed acquisition of Potash. BHP told Santander that it needed a response by August 11, 2010. Later on August 4, 2010, BHP and Santander executed confidentiality agreements, and

4

Santander assembled a team to conduct due diligence and determine whether it could support the underwriting.

17.     On August 9, 2010, Santander's Executive Committee met and formally approved the proposed $10.5 billion underwriting commitment. A few hours later, Santander executives communicated the firm's financing commitment to BHP's Chief Financial Officer at a meeting in Madrid.

18.     On August 12, 2010, BHP's CEO met with Potash's CEO and presented BHP's proposal to acquire Potash for a total of $38.6 billion. Potash's CEO responded that Potash was "not for sale." Nevertheless, that same day BHP delivered letters to Potash summarizing the acquisition proposal, and setting forth BHP's financing facilities, the due diligence conducted, and certain undertakings that BHP would be prepared to take in connection with the proposed acquisition.

19.     On August 13th, Potash's Board met to discuss the BHP offer and retained advisors to analyze the proposed acquisition. Three days later, on August 16, 2010, Potash's Board convened and voted to reject the offer.

20.     On August 17, 2010, Potash informed BHP that the acquisition proposal grossly undervalued Potash and that the acquisition did not serve the best interests of the company's shareholders.

21.     That same day, Potash publicly announced that its Board had received and rejected BHP's unsolicited offer to purchase the common stock of Potash for $38.6 billion, or $130 per share in cash, which amounted to a 16% premium to the closing price of Potash's stock on the previous day.

22.     Following the announcement, on August 17, 2010, Potash's share price soared, closing at $143.17, up $31.02, or 27.7%, from the previous day's closing price.

23.     The next day, BHP publicly disclosed that it had commenced an almost $40 billion hostile bid for all of the issued and outstanding common shares of Potash.

24.     Potash opposed BHP's hostile bid, filed a lawsuit to enjoin the takeover, and asked the Canadian government to intervene.  The Canadian government eventually opposed the offer from BHP, and the proposed acquisition never took place.

### B.     Cañas Acquires Material Nonpublic Information

25.     On or about August 5, 2010, Santander's Global Head of Corporate and Investment Banking ("Global Head of CIB") instructed Santander's Head of European Loans to draft a detailed memorandum regarding BHP's potential acquisition of Potash and the financing commitment requested from Santander ("Acquisition Memo").  Thereafter, Santander's Head of European Loans and Santander's Junior Product Specialist for UK Loans ("Junior Product Specialist") drafted the Acquisition Memo.  The purpose of the Acquisition Memo was to gain the CEO's support for the underwriting engagement at an upcoming meeting of Santander's Executive Committee.

26.     The Acquisition Memo described, among other things, BHP's request that Santander provide $10.5 billion in financing for BHP's proposed $45 billion Potash acquisition, with most of the remaining amount dispersed among three other banks.  The memo stated that the proposal was highly confidential and that the information had not been shared with the acquisition target.

27.     The memo further stated that Santander needed to provide its financing guarantee by August 11, 2010 so that BHP could immediately communicate the offer to Potash and

6

commence negotiations.  Finally, the memo indicated that BHP would launch the deal, either through a friendly or hostile bid, no later than the first week of September 2010.

28.      On August 5, 2010, Santander's Global Head of CIB sent Santander's CEO an e-mail attaching the Acquisition Memo.  Santander's Global Head of CIB also sent an e-mail to the Head of European Loans and directed him to forward the Acquisition Memo to Cañas.

29.      That day, Santander's Head of European Loans e-mailed a copy of the Acquisition Memo to Cañas.  Later that night, Santander's Head of European Loans called Cañas and discussed the proposed Potash acquisition with him.

30.      On August 9, 2010, Santander's Head of European Loans informed Cañas that the $10.5 billion financing commitment requested by BHP had been approved by Santander's Executive Committee.

31.      On August 11, 2010, Cañas attended a lunch meeting with Santander's Head of European Loans and the Junior Product Specialist.  During that lunch meeting, the three Santander executives discussed the Potash acquisition, including the timing of the deal.

32.      In addition to these discussions, on a number of other occasions between August 5 and August 17, 2010, at least four Santander executives, including Santander's CEO, discussed BHP's proposal and the status of the potential Potash acquisition with Cañas.

C.      **Cañas Violates Santander's Insider Trading Policies**

33.      During the period of time at issue in this case, Santander had a Code of Conduct in Securities Markets ("Code of Conduct"), which governed the personal securities trading of covered employees.

34.      The Code of Conduct required all covered Santander employees to execute their personal securities transactions through Santander Group institutions and report their personal

trading shortly after the end of each calendar month. Moreover, the Code of Conduct forbade trading in speculative products, such as CFDs.

35.    In addition, the Code of Conduct mandated that covered Santander employees notify the firm's compliance department whenever they acquire sensitive information, such as information concerning a proposed merger/acquisition. Finally, the Code of Conduct also prohibited covered Santander's employees from using confidential client information to trade or recommend that others trade securities.

36.    Cañas executed Santander's Code of Conduct on October 27, 2009, and he violated the Code of Conduct in a variety of ways in connection with the proposed Potash acquisition.

37.    Cañas never reported to Santander that he learned about the pending Potash acquisition. In addition, Cañas traded Potash securities in his account outside the Santander Group. And Cañas never reported his Potash trades to Santander.

38.    As described below, Cañas also violated Santander's Code of Conduct by purchasing for himself, and recommending that Marín purchase, Potash securities based upon his knowledge of the proposed Potash acquisition.

**D.    Cañas Purchases Potash Securities Based on Material, Nonpublic Information**

39.    Between August 9 and 13, 2010, based upon material, nonpublic information about the potential acquisition, Cañas purchased the equivalent of 30,000 shares of Potash common stock through highly-leveraged securities known as CFDs. CFDs are not traded in the United States, but are traded based on securities listed on U.S. exchanges.

8

40. Cañas purchased 30,000 Potash CFDs through an Internaxx, S.A. ("Internaxx") brokerage account, which he opened in 2008. Internaxx is a TD Ameritrade affiliate that is based in Luxembourg.

41. Before August 2010, Cañas had never purchased Potash securities in his Internaxx account. However, Cañas had used his Internaxx account to purchase equity CFDs on other stocks, and he realized both large gains and losses.

42. Accordingly, before purchasing Potash securities, Cañas was well aware of the risks and benefits of equity CFD ownership, as well as Internaxx's procedures and margin requirements associated with trading CFDs.

43. The Potash CFDs purchased by Cañas were equity CFDs. An equity CFD is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed. If the share price increases, the seller pays the difference to the buyer; however, if the share price declines, the buyer must pay the seller.

44. Equity CFDs mirror the movement and pricing of the underlying stock on a dollar-for-dollar basis, so any fluctuation in the public market price of the underlying security is reflected in the unrealized gain or loss of the CFD position. The purchase and sale prices of equity CFDs are identical to the prices quoted for the shares on the public exchange on which the underlying common stock is listed.

45. Generally, the purchaser of a long CFD position benefits by acquiring the future price movement of the underlying common stock without having to pay for or take formal ownership of the underlying shares. Usually, purchasers of long CFDs receive other benefits commonly associated with stock ownership, such as the right to receive dividend payments and

participate in stock splits.  CFDs normally do not have an expiration date or delivery date, and there is no restriction on the entry or exit price of a CFD.

46.     An equity CFD purchaser typically initiates a long position in the same manner in which he or she would purchase common stock, by submitting an order with a CFD provider to buy a certain number of CFDs in a particular stock.  The provider ordinarily purchases the corresponding number of the underlying shares to hedge its position and writes the CFDs to the client at the same price.  As with stock transactions, the buyer is able to enter market, limit, or stop loss orders when initiating CFD positions.

47.     Finally, when initiating an equity CFD position, the buyer normally is not required to pay for the related shares or any premium.  So the only costs associated with CFDs are transaction fees charged by CFD providers when a customer opens and closes a position, plus a potential payout based on any decline in the value of the underlying asset.  However, CFD providers typically require the purchaser to post margin on the underlying equity value.

### E.     Cañas's CFD Purchases Are In Connection With and Cause The Purchase of U.S. Exchange Listed Securities

48.     Between August 9 and 13, 2010, Cañas purchased 30,000 Potash equity CFDs through his Internaxx brokerage account.  Internaxx acted as the CFD provider, and Cañas used limit orders based on the current share price of Potash common stock to initiate his Potash CFD positions.

49.     Upon receiving each order, Internaxx purchased an equivalent number of NYSE-listed Potash shares at a price at or better than Cañas's specified limit price to establish the price of Cañas's CFD positions, as well as to hedge its risk and remain neutral in the transaction. Internaxx purchased all 30,000 shares of Potash stock through U.S. exchanges.

50.     Internaxx notified Cañas of its Potash stock purchase orders (which matched Cañas's requested CFD quantity and limit prices), and partial order executions, before it filled each of his CFD orders.  The CFD contract prices were established based on the average price at which Internaxx acquired each share of Potash stock.

51.     The 30,000 Potash contracts that Cañas initiated had an aggregate notional value of $3,350,235 -- which means that Cañas would have had to pay that amount in order to acquire that number of underlying shares.  Cañas was entirely leveraged in his CFD positions because he did not pay Internaxx any portion of the value of the underlying share price.  For each dollar that the Potash shares increased in value, Cañas would earn $30,000, and he would owe Internaxx $30,000 for each dollar in value that the shares fell.

52.     Cañas was not required to deposit any funds on margin in connection with his purchase of Potash CFDs because he already had an account balance of $1,490,598.79 with Internaxx.  Consequently, Cañas paid Internaxx a total of only $1,500, or $0.05 per CFD, in commission fees to purchase the Potash CFDs.

53.     In purchasing these securities, Cañas bid aggressively and was willing to take on added risk even as Potash's share price declined.

54.     On August 9th, Cañas entered a limit order to buy 10,000 Potash CFDs at a price of $112.44 each.  Shortly thereafter, Internaxx purchased the underlying stock through NYSE Arca at Cañas's limit price.

55.     On August 10th, Cañas entered a limit order to buy another 10,000 Potash CFDs at a price of $110.97 each.  Shortly thereafter, Internaxx purchased the underlying shares through NYSE Arca.

56.     On August 11th, Potash stock closed at $108.20, down $3.56 or 3.19% from the previous day, leaving Cañas with an unrealized loss of $70,100 on his 20,000 CFD position.

57.     The next day, August 12th, Potash stock opened even lower, at $106.85. However, Cañas entered another limit order to buy 5,000 Potash CFDs at a price of $111.71 each.  Shortly thereafter, Internaxx purchased the corresponding Potash stock at prices ranging between $111.65 per share and Cañas's limit price of $111.71 per share.  Internaxx purchased 4,100 of these 5,000 Potash shares through NYSE Arca; the remaining shares were purchased through BATS Exchange BZX (700 shares) and Direct Edge's EDGX Exchange, Inc. (200 shares).

58.     On August 13th, Cañas entered a fourth limit order to buy 5,000 more Potash CFDs at $111.55 each.  Again, Internaxx purchased the stock through NYSE Arca at Cañas's limit price shortly thereafter.

59.     On August 17, 2010, after Potash announced that it had rejected BHP's offer, Cañas entered two 15,000 share sell orders at a limit price of $142.  Upon receiving these limit orders, Internaxx sold the corresponding shares of Potash stock through NYSE Arca and NASDAQ to lock in the sale price.

60.     Cañas liquidated his entire Potash CFD position for total proceeds of $920,239.44.  Cañas had to pay Internaxx another $1,500 in commission fees on the sale transactions.  In just eight days, Cañas realized a net profit of $917,239.44 while paying just $3,000 in commissions.

F.      **Cañas Tips Marín, Who Then Trades in Potash Securities**

61.     Marín grew up with Cañas, and they are close, personal friends.  In August 2010, Marín knew that Cañas worked in a high-ranking position at Santander.  Marín also knew

12

Cañas's wife and was a frequent visitor to Cañas's home in 2010 and beyond.

62.     During the relevant time period, Marín and Cañas communicated multiple times a week, discussing everything from exercising to video games to investing.  During August 2010, Cañas communicated with Marín by mobile telephone, text message, and e-mail more than a hundred times.  More specifically, Cañas called Marín 23 times that month, and sent him 67 text messages.  Cañas also received 26 text messages from Marín in August 2010.

63.     Marín has admitted that he discussed investing in Potash with Cañas in August 2010 prior to purchasing Potash stock.

64.     Between August 10 and 12, 2010, based upon material, nonpublic information about the potential acquisition, Marín purchased 1,393 shares of Potash common stock through two Spanish brokerage accounts.  In just one week, Marín generated net trading profits of about $43,566, or a return of 28.47%, by trading Potash stock.

(1)     **Marín Trades Potash Stock in his Openbank Brokerage Account**

65.     On March 28, 2001, Marín opened an online brokerage account with a predecessor company of Openbank, S.A. ("Openbank").  From the day that he opened his account until August 10, 2010, Marín did not execute a single securities transaction in that account.

66.     On August 10 and 11, 2010, Marín paid $136,093 to purchase 1,238 shares of Potash stock in his Openbank brokerage account.  All of the shares were purchased through the NYSE.

67.     Marín financed his trades by cancelling a 6-month fixed income investment held in his Banco Español de Crédito, S.A. ("Banesto") bank account -- two months short of its expiration.  Marín then transferred 104,000 Euros (approximately $136,000), which were the

proceeds from liquidating the fixed income product, into his Openbank account.

68.    On August 10, 2010, Marín placed a market order to acquire 581 shares of Potash stock and paid $111.40 per share, for a total cost of $64,819.69.

69.    The next day, August 11, 2010, Marín purchased an additional 657 shares of Potash stock at $108.32 per share, for a total cost of $71,272.91, even though Potash's share price was declining rapidly.

70.    On both days, Marín purchased his Potash shares immediately after the opening of the NYSE. Marín did not purchase any other securities in his account before August 17, 2010.

71.    On August 17, 2010, Marín placed a market order to sell all 1,238 Potash shares for a total of $173,255.87. Marín's trades in Potash stock provided him with a net gain of $37,163.27, or 27.31%, in just seven days.

(2)    **Marín Trades Potash Stock in his Kutxabank Brokerage Account**

72.    Marín opened a brokerage account at Kutxabank on December 24, 2004. In the almost six years before his Potash trades, Marín only purchased stock in three companies, none of which were U.S. exchange-listed companies.

73.    On August 10, 2010, Marín cancelled a long-term, fixed income product and transferred 10,605.17 Euros into his Kutxabank brokerage account. Two days later, Marín paid 13,013.05 Euros (or $16,917) to purchase an additional 155 shares of Potash stock at $106.89 per share. All of these shares were purchased through the NYSE.

74.    On August 19, 2010, Marín sold all 155 shares of Potash stock at $147.88 per share, for a total of $23,320. Marín realized a net profit of approximately $6,403, or 37.85%.

(3)    **Marín Lacks Investment Experience But Expects A Quick Profit**

75.    On August 9, 2010, before purchasing the Potash stock, in a recorded telephone

14

call, Marín told an Openbank representative that he did not know how to put money into his account in order to trade stocks. Marín also inquired whether he was allowed to trade up to the cash limit in his account, if he could trade U.S. stocks, and whether there were specific limits on U.S. shares. Marín explained that he planned to cancel a long-term deposit in a Banesto bank account to purchase stock, and he needed to transfer the money quickly before he left for vacation. Marín stated that he planned to make only one purchase and a single sale, and the whole transaction would be completed in one or two days.

76.     On August 10, 2010, after purchasing the Potash stock, Marín, in another recorded telephone call to Openbank, stated that he recently sold a long-term deposit with a favorable interest rate to purchase stock. He volunteered that he planned to sell the stock within one to two weeks, and asked whether the same interest rate would be available on the fixed-income product if he then reinvested his profits.

G.     **Santander Conducts an Internal Investigation**

77.     In October 2010, Santander began an internal investigation to ascertain whether Cañas had access to material, nonpublic information relating to the proposed Potash acquisition, and whether he traded Potash securities based upon that information.

78.     On October 13, 2010, Santander suspended Cañas, seized his work computer and Blackberry device, and escorted him from Santander's offices.

79.     On January 13, 2011, Santander issued a report of its investigation, which concluded that Cañas had obtained material, nonpublic information about the proposed Potash acquisition on August 5, 2010 -- just one day after BHP retained Santander.

80.     In addition, during Santander's internal investigation, Cañas admitted that the Head of European Loans had informed him that BHP had requested financing from Santander in

15

connection with a potential Potash acquisition.

## CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

81.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1-80, inclusive, as if they were fully set forth herein.

82.     The information communicated to Cañas about the potential Potash acquisition, which Cañas provided to Marín, was both material and nonpublic.  The information was considered confidential by Santander, Cañas's employer, and Santander's client, BHP, and Santander had policies protecting its own and its clients' confidential information.

83.     Cañas learned the inside information that he used to make the securities transactions alleged herein during the course of his employment, and Cañas knew or recklessly disregarded that he, directly, indirectly, or derivatively, owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information confidential.

84.     Cañas deliberately or recklessly used the inside information to place trades in his personal account.

85.     Cañas deliberately or recklessly tipped the inside information to Marín with the expectation of receiving a benefit.

86.     Marín either knew, or had reason to know, that the material information he received from Cañas about the potential Potash acquisition was conveyed in breach of a fiduciary duty or obligation arising from a similar relationship of trust and confidence.

87.     Marín intentionally or recklessly used the inside information that he received from Cañas to purchase Potash securities for himself.

88.     At all times relevant to this Complaint, each of the Defendants acted knowingly or

recklessly.

89.    By virtue of the foregoing, Defendants Cañas and Marín, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

        a)  employed devices, schemes, or artifices to defraud;

        b)  made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

        c)  engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon persons.

90.    By reason of the foregoing, Defendants Cañas and Marín, directly or indirectly, violated, and unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

### CLAIM II
### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder

91.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1-90, inclusive, as if they were fully set forth herein.

92.    By at least August 5, 2010, substantial steps had been taken to commence a tender offer for the securities of Potash by BHP, which was publicly announced on August 17, 2010.

93.    Prior to the public announcement of the tender offer for Potash, and after a substantial step or steps to commence such tender offer had been taken, Defendants Cañas and Marín, while in possession of material information relating to such tender offer, which information they either knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner,

17

employee, or any other person acting on behalf of the offering company or issuer, purchased or sold or caused to be purchased or sold securities of Potash.

94.     By reason of the foregoing, Defendants Cañas and Marín violated, and unless enjoined will again violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Exchange Act Rule 14e-3 [17 C.F.R.§ 240.14e-3] thereunder.

<b><u>PRAYER FOR RELIEF</u></b>

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

<b>I.</b>

Permanently restraining and enjoining Defendants from, directly or indirectly, violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. § 78j(b) and 15 U.S.C. § 78n(e)] and Rules 10b-5 [17 C.F.R. § 240.10b-5] and 14e-3 [17 C.F.R. § 240.14e-3] thereunder;

<b>II.</b>

Ordering Defendants to disgorge all ill-gotten gains or unjust enrichment they derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

<b>III.</b>

Ordering each Defendant to pay a civil penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

<b>IV.</b>

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, the Commission demands

that this case be tried before a jury.

Respectfully submitted,

**SECURITIES AND EXCHANGE
COMMISSION**

By: _____

Frank D. Goldman (GoldmanF@sec.gov)
Robert M. Moye (MoyeR@sec.gov)
John E. Birkenheier (BirkenheierJ@sec.gov.)
175 West Jackson Boulevard, Suite 900
Chicago, IL 60604-2615
Tel.: (312) 353-7390
Fax: (312) 353-7398

*Attorneys for the Plaintiff*

Of Counsel
Daniel M. Hawke
Kathryn A. Pyszka